# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

MARIO LOPES BENITEZ,

    *Petitioner*,

                         3:08-cv-00543-ECR-VPC

vs.                               ORDER

E.K. MCDANIEL, *et al.*,

    *Respondents*.

    This habeas matter under 28 U.S.C. § 2254 comes before the Court for a final decision on the remaining claims and on petitioner's motion (#67) for partial dismissal.

## *Background*

    Petitioner Mario Lopes-Benitez seeks to set aside his December 4, 2001, Nevada judgment of conviction, pursuant to a jury verdict, of sexual assault of a minor under the age of fourteen. Petitioner challenged his conviction both on direct appeal and state post-conviction review.

    The evidence presented at trial tended to establish the following.[1]

    / / / /

---

[1] The Court makes no credibility findings or other factual findings regarding the truth or falsity of evidence or statements of fact in the state court. The Court summarizes same solely as background to the issues presented in this case, and it does not summarize all such material. No statement of fact made in describing statements, testimony or other evidence in the state court constitutes a finding by this Court. The significance of additional specific evidence or categories of evidence referred to by petitioner in support of his claims is discussed in the discussion of the particular claims. The present recital of the evidence constitutes only an overview for context. Any absence of mention of a specific piece of evidence or category of evidence in this overview does not signify that the Court has overlooked the evidence in considering petitioner's claims.

At the time of the trial, Lopes-Benitez was charged with one count of sexual assault of a minor under the age of fourteen and one count of first-degree kidnapping.[2]

The victim, R.M., was thirteen-years old at the relevant time. According to her mother's testimony, introduced over defense objection, R.M. had been deaf and mute since the age of fourteen months as a result of spinal meningitis. She also suffered from frequent seizures as a result and required twenty-four hour supervision. She attended a special school for challenged children and was able to communicate only through rudimentary sign language.[3]

The registered nurse who assisted in the sexual assault examination, who previously had been a nurse practitioner in another jurisdiction, testified, without objection, that the case was very distinctive in her recollection because R.M. was mentally delayed.[4]

During the late afternoon of March 15, 2001, after 5:30 p.m., R.M. was out sweeping in the front of the house with the front door open with R.M.'s mother and an older sister monitoring from inside. At one point, her mother retrieved some medication from another room in the house for some friends who had called. When she looked back out front, at about 5:50 p.m., R.M. was no longer there. When she and the sister could not find R.M., a number of family members and friends went looking for her in the neighborhood. Fairly quickly, they flagged down police officers, who also began searching door to door in the neighborhood.[5]

As the search continued, R.M.'s mother and her sister-in-law, Sandra Mariscal, saw a white van coming toward them and then make a turn down another street. As the van turned, R.M.'s mother heard her scream. She testified initially that R.M. would scream like that when she was upset but she testified thereafter that "she could be excited or she could be upset, but at that point she probably was excited to see me." Mariscal had not heard R.M. scream that loudly before. #20, Ex. 6, at 40-43 & 83-88; *id.*, Ex. 7, at 21-22, 35-38.

---

[2]#19, Ex. 5.

[3]#20, Ex. 6, at 23-27, 56-60, 70-71 & 74-76.

[4]#21, Ex. 8, at 99-100.

[5]#20, Ex. 6, at 28-40, 66-69 & 77-83; *id.*, Ex. 7, at 71-79, 98-101 & 107-08; #21, Ex. 8, at 7-8.

1     R.M.'s mother and Mariscal ran after the slow-moving van, which eventually came to

2  a stop.  The van was being driven by Lopes-Benitez.  R.M. had been inside in the passenger

3  seat.  She exited as the women approached, holding a grocery bag with soup packets.[6]

4     While petitioner has sought to maintain herein that R.M. was in an overall happy state

5  at this time, neither R.M.'s mother nor Sandra Mariscal so testified.  R.M.'s mother testified

6  only that R.M. was happy *to see her and Mariscal*.  Happiness or relief at seeing her mother

7  was not necessarily the same thing as then being in an overall state of happiness.  Sandra

8  Mariscal -- who reached the van and R.M. first – affirmatively testified that R.M. was *not* in a

9  state of happiness when they encountered her.  Mariscal testified that R.M. made her sign for

10  pain, pointed to her private area, and pointed to Lopes-Benitez.  According to Mariscal, when

11  R.M. was sad, she would not cry but would have a certain sad face, which she had then.[7]

12     Standing at the passenger side of the vehicle, R.M.'s mother initially thanked Lopes-

13  Benitez for bringing her daughter back.  However, when Lopes-Benitez said that R.M. had

14  asked him for a ride, her mother replied that that was "stupid" because R.M. could not speak.

15  She then started asking him what he had done to her daughter.   Without asking, R.M.'s

16  mother got up into the van directing him to drive to her nearby house to see the police.  She

17  then saw her adult son Jesus, and they switched places with the mother exiting the van.

18  R.M.'s mother then walked back to the house with R.M. and Mariscal while Jesus rode in the

19  van directing Lopes-Benitez to the house.  As the women approached the house, they told

20  the police that they had found R.M.; and they tried to direct their attention, speaking in

21  Spanish to English-speaking officers, to the man in the van.[8]

22     The police started separating the various parties so that they could be interviewed

23  individually.  Before the lead officer instructed them to not do so, R.M. went into the restroom

24  with her mother and urinated.  R.M. indicated to her mother that she was experiencing pain

---

26    [6]#20, Ex. 6, at 43-45, 89-90 & 96-97; *id*., Ex. 7, at 22-23, 32 & 35-38.

27    [7]#20, Ex. 6, at 88; but cf. *id*., at 90 (normal); *id*., Ex. 7, at 23-32 & 39; but cf. *id*., at 41-42 (calm).

28    [8]#20, Ex. 6, at 45-51, 59-60, 91-94 & 98-99; *id*., Ex. 7, at 32-35, 39-42, 46-52 & 79-85.

when she urinated.  Police officers interviewed the witnesses other than R.M. through a bilingual officer.[9]

After the interviews of the family members, R.M. was taken to the hospital for a sexual assault examination.  At the hospital, the lead officer conducted a limited interview of R.M. He asked her questions through a bilingual family member who then relayed the question to R.M.'s mother in Spanish who then asked R.M. the question using her rudimentary signs.[10]

As discussed in greater detail, *infra*, Dr. Michael Zbiegien, M.D., examined R.M. for suspected sexual assault.  Dr. Zbiegien's examination reflected, *inter alia*, a fresh tear and bruising of the hymen at the 6 o'clock position and the presence of seminal fluid.  He opined that R.M. had been a virgin previously and had been subjected to penile penetration.[11]

Back at the neighborhood, a police officer gave Lopes-Benitez the *Miranda* advisements and interviewed him.  Lopes-Benitez – who was 39 years old at the time[12] – stated that he was driving in front of Lincoln Elementary School and thought that R.M. was a friend of his.  According to petitioner's account to the officer, he stopped but then realized that she was not someone that he knew.  He maintained that she then asked him through signs to give her a ride to her house.  Lopes-Benitez did not state to the officer that R.M. was with him at his apartment or that anything occurred there.  Lopes-Benitez denied having any sexual contact with R.M.  According to Lopes-Benitez, he just gave R.M. a ride in his van.[13]

Thereafter, after the sexual assault examination, the lead officer transported R.M. and a family member back to the neighborhood.  Lopes-Benitez no longer was present at this point, but the van still was present.  The officer brought R.M. to the van and asked her

---

[9]#20, Ex. 6, at 51-52 & 94-95; *id.*, Ex. 7, at 34-35, 64-66, 85-88, 101-02 & 108-111.

[10]#20, Ex. 6, at 52-54; *id.*, Ex. 7, at 34-35, 66-68, 87-91 & 97.

[11]See text and record citations, *infra*, at 29-30.  See also #21, Ex. 8, at 85-108 (testimony by adjunct support personnel).

[12]See,e.g., Hearing Exhibit No. 45, at 1 (January 24, 1962, birth date); #60, Hearing Tr., at 54.

[13]#21, Ex. 9, at 96-105.

-4-

1  through sign language and through the family member to point to where the incident occurred.
2  R.M. initially refused to look at the van.  Ultimately, she looked into the van, and she pointed
3  to a white box in the back end of the van.[14]

4      The State and defense stipulated at trial that the crime scene analyst who examined
5  the van would testify that he did not find any evidence of seminal fluid during forensic
6  examination of the interior of the van, including the back cargo area.[15]

7      As noted previously, however, seminal fluid was found during the sexual assault
8  examination.  DNA analysis of sperm cells in seminal fluid recovered from the inner lining of
9  R.M.'s underwear reflected that the cells "did originate from Mario Lopez-Benitez."[16]  DNA
10  analysis of sperm cells in dried seminal fluid recovered from the victim's body outside of her
11  vagina did not exclude Lopes-Benitez.[17]  Analysis of the samples recovered from internal
12  vaginal swabs were positive for the presence of semen.  However, too few sperm cells were
13  recovered by the swabs to produce DNA test results, although the analyst ran the test.[18]

14      At trial, in addition to testimony as to the foregoing, the State, over defense objection,
15  put R.M. on the stand.  The State put R.M. on the stand not as a competent witness to testify
16  as to what occurred but instead as a demonstrative exhibit as to her capacity and ability to
17  communicate.  She was asked questions through a sign interpreter.  R.M. was able to answer
18  questions through the sign language interpreter seeking her name, her mother's name, her
19  age, the number but not the street of her home address, and whether she went to school.
20  She did not give clear or significantly meaningful answers – through the sign language
21  interpreter – and/or did not know the answer to questions as to where she went to school,

22

23      [14]#20, Ex. 7, at 91-97.

24      [15]#21, Ex. 8, at 3-5 & 67; *id.*, Ex. 9, at 3-7.

25      [16]#21, Ex. 8, at 46-47; see also *id.*, at 22, 34-35, 64, 83, 89-90 & 93-95.

26
27      [17]*Id.*, at 48-51; see also *id.*, at 37-39, 61-64, 77-83 & 102-04 (recovery by nurse from "around the genital area").

28      [18]*Id.*, at 35-38, 51, 70-73 & 82-83; see also *id.*, at 104-05.

-5-

1    what her birthday was, what she studied in school, how to get to her house, or how she got

2    to court that morning.[19]

3         The sign language interpreter later testified as a witness in her own right.  She had

4    acted as an interpreter with R.M. during prior interviews at the prosecutor's office and at the

5    trial.  She testified that R.M. was only a minimal language user with respect to formal sign

6    language and that she used only informal homegrown signs that were familiar only to her and

7    her family and school friends.  The interpreter was unable, despite being a qualified

8    interpreter, to have a meaningful conversation with the thirteen year old.  She acknowledged,

9    however, that R.M. would have been capable of making common generic gestures to a

10   stranger, such as wanting something to drink, waving hello or goodbye, or blowing kisses.[20]

11        During the State's case-in-chief, defense counsel elicited testimony from R.M.'s mother

12   on cross as to whether R.M. folded her clothes when she took off her school clothes in the

13   afternoon.  Her mother responded that she folded and hung up her clothes.[21]  Lopes-Benitez

14   of course had not testified at that point in the trial.  In his prior statement to the police, he had

15   made no mention of anything involving folding of clothes.

16        Lopes-Benitez did testify at trial.  He elected to do so against the advice of defense

17   counsel, who believed that his anticipated testimony would admit the commission of a crime

18   with the thirteen year-old victim.  Petitioner apparently advised counsel that he intended to

19   testify during the lunch break after the State rested.[22]

20        According to Lopes-Benitez' trial testimony, the following occurred.  As he was pulling

21   into the parking area at his home, he yielded to R.M. who was walking by.  She then came

22

23        [19]#20, Ex. 7, at 12-16, 43-46 & 53; see also id., Ex. 6, at 57; #21, Ex. 9, at 112; #22, Instr. "D."  At the
preliminary hearing, the defense called R.M. as a testimonial witness in an effort to show that the State could
24   not present competent evidence of a sexual assault.  After unsuccessful attempts were made in eliciting
testimony confirming her understanding of the concepts of telling the truth and lying, the state justice court did
25   not allow introduction of any attempted testimony as to the incident itself from R.M.  See #19, Ex. 4, at 69-82.

26        [20]#21, Ex. 9, at 114-29.

27        [21]#20, Ex. 6, at 91.

28        [22]#21, Ex. 9, at 41-44 (stating, after the colloquy and break, "[t]oday, the defendant informs me . . .").

1 and got into his van while laughing or smiling at him.  After he parked, he asked her what she

2 wanted, but she just kept on laughing.  He did not think that she was underage.[23]

3 As petitioner's account continued, when he opened the door to his apartment, R.M.

4 motioned that she wanted something to drink, followed him in, went to the refrigerator, and

5 got herself a soft drink and something to eat.  She then rummaged around through his kitchen

6 and apartment, eventually picking up a package of individual soup packets.  Lopes-Benitez

7 told her that she could take four packets.[24]

8 Lopes-Benitez maintained that R.M. then motioned that she wanted to go to the

9 restroom, went in without closing the door, just lowered her pants, and then was laughing and

10 smiling at him while she used the restroom.  When she came out, she did not pull her pants

11 back up and went over and sat on the couch.  She then removed her shoes, socks, pants,

12 and underwear, folding her clothing neatly.  Lopes-Benitez maintained that R.M. then put one

13 leg up on the couch while she masturbated and blew kisses at him.[25]

14 According to Lopes-Benitez, he began masturbating in response, from four or five feet

15 away, without making contact with R.M.  He maintained that when he ejaculated, he took a

16 step and his semen landed on R.M.'s vagina.  He denied touching R.M. or penetrating her.[26]

17 Afterwards, R.M. got dressed again.  Lopes-Benitez thereafter was giving her a ride

18 to her house when they encountered her relatives.  He asserted that he was giving her a ride

19 because he was a gentleman and respected all women.  According to Lopes-Benitez, R.M.

20 was laughing when they saw her relatives on the way to her home.  #21, Ex. 9, at 61-64,

21 75-76 & 89-93.

22

23 [23]#21, Ex 9, at 57-58 & 69-72.  The Court again makes no finding of fact or credibility determinations

24 by summarizing assertions made in the state courts.  The Court merely is using declarative statements to concisely summarize accounts given by witnesses, including petitioner, rather than beginning each and every sentence with, *e.g.*, "according to petitioner."

25
[24]*Id.*, at 58-59 & 71-72.

26
[25]*Id.*, at 59-60 & 81-86.

27

28 [26]*Id.*, at 60-62, 65-66, 81-86 & 88-89.  See, in particular, *id.*, at 62 ("I swear I didn't.  I didn't touch her."); *id.*, at 85 ("From afar.  It was intentional, but I didn't touch her.  I never touch her.").

On cross-examination, Lopes-Benitez acknowledged that he had not told the police officer who interviewed him on the evening of the incident about any of these alleged events at his home.  He acknowledged that the account that he instead had given to the officer was, with the exception of R.M. seeking a ride afterwards, in his words, "not true."  He maintained that he did not tell the police about the alleged incidents at his home "because that was only to be told to the attorney."[27]

On cross-examination, Lopes-Benitez also acknowledged from the stand that "the semen found in the case" was his.[28]

Lopes-Benitez accordingly substantially confessed in his testimony to at the very least lewdness with a minor under fourteen years of age, a lesser but nonetheless still substantial offense under Nevada law.  Alleged consent was not a defense to such an offense.[29]

Petitioner was convicted of sexual assault with a minor under fourteen years of age but was acquitted of first-degree kidnapping.

### Standard of Review on the Merits

The Antiterrorism and Effective Death Penalty Act (AEDPA) imposes a "highly deferential" standard for evaluating state-court rulings that is "difficult to meet" and "which demands that state-court decisions be given the benefit of the doubt."  *Cullen v. Pinholster*, 131 S.Ct. 1388, 1398 (2011).  Under this highly deferential standard of review, a federal court may not grant habeas relief merely because it might conclude that the state court decision

---

[27]#21, Ex. 9, at 72-81 & 87-88.  Lopes-Benitez' actual confidential communications with his attorney of course were protected by the attorney-client privilege.  However, the attorney-client privilege also of course does not provide someone with a legitimate basis to tell the police whatever one wants regardless of its truth or falsity if one chooses to speak with them.  Lopes-Benitez further of course had a Fifth Amendment right to be silent, of which he was advised before speaking with the police.  However, the right to remain silent also is not a privilege to say whatever one wants to the police regardless of its truth or falsity if one chooses to speak with them.  Lopes-Benitez in truth provided no legitimate explanation for telling the police one thing and then telling a different story at trial.

[28]#21, Ex. 9, at 93-94.

[29]See N.R.S. 201.230 (providing for a mandatory life sentence with a minimum 10 years before eligibility for parole review); #22, Ex. 11, Instruction Nos. 15-16 (the record exhibit is misidentified in the index of exhibits).  Petitioner was sentenced on the sexual assault conviction to the then mandatory life sentence with a minimum 20 years before eligibility for parole consideration.  Both require lifetime supervision.

1   was incorrect.  131 S.Ct. at 1411.  Instead, under 28 U.S.C. § 2254(d), the court may grant

2   relief only if the state court decision: (1) was either contrary to or involved an unreasonable

3   application of clearly established law as determined by the United States Supreme Court

4   based on the record presented to the state courts; or (2) was based on an unreasonable

5   determination of the facts in light of the evidence presented at the state court proceeding.

6   131 S.Ct. at 1398-1401.

7       A state court decision is "contrary to" law clearly established by the Supreme Court only

8   if it applies a rule that contradicts the governing law set forth in Supreme Court case law or

9   if the decision confronts a set of facts that are materially indistinguishable from a Supreme

10   Court decision and nevertheless arrives at a different result.  *E.g.*, *Mitchell v. Esparza*, 540

11   U.S. 12, 15-16 (2003).  A state court decision is not contrary to established federal law merely

12   because it does not cite the Supreme Court's opinions.  *Id.*  Indeed, the Supreme Court has

13   held that a state court need not even be aware of its precedents, so long as neither the

14   reasoning nor the result of its decision contradicts them.  *Id.*  Moreover, "[a] federal court may

15   not overrule a state court for simply holding a view different from its own, when the precedent

16   from [the Supreme] Court is, at best, ambiguous."  540 U.S. at 16.  For, at bottom, a decision

17   that does not conflict with the reasoning or holdings of Supreme Court precedent is not

18   contrary to clearly established federal law.

19       A state court decision constitutes an "unreasonable application" of clearly established

20   federal law only if it is demonstrated that the state court's application of Supreme Court

21   precedent to the facts of the case was not only incorrect but "objectively unreasonable."  *E.g.,*

22   *Mitchell*, 540 U.S. at 18; *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004).

23       To the extent that the state court's factual findings are challenged, the "unreasonable

24   determination of fact" clause of Section 2254(d)(2) controls on federal habeas review.  *E.g.,*

25   *Lambert v. Blodgett*, 393 F.3d 943, 972 (9th Cir. 2004).  This clause requires that the federal

26   courts "must be particularly deferential" to state court factual determinations.  *Id*.  The

27   governing standard is not satisfied by a showing merely that the state court finding was

28   "clearly erroneous."  393 F.3d at 973.  Rather,  AEDPA requires substantially more deference:

> . . . . [I]n concluding that a state-court finding is unsupported by substantial evidence in the state-court record, it is not enough that we would reverse in similar circumstances if this were an appeal from a district court decision. Rather, we must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record.

*Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004); *see also Lambert*, 393 F.3d at 972.

Under 28 U.S.C. § 2254(e)(1), state court factual findings are presumed to be correct unless rebutted by clear and convincing evidence.

The petitioner bears the burden of proving by a preponderance of the evidence that he is entitled to habeas relief. *Pinholster*, 131 S.Ct. at 1398.

### *Discussion*

### *Ground 2: Alleged Prosecutorial Misconduct in Closing Argument*[30]

In Ground 2, in the exhausted portions that remain, petitioner alleges that he was denied rights to a fair trial and to due process under the Fifth, Sixth and Fourteenth Amendments due to prosecutorial misconduct in the State's closing argument.[31] Petitioner bases the claim on the prosecutor's comments directed to Lopes-Benitez' account of the events at trial, as summarized, *supra*, at 6-8.

In the amended petition, Lopes-Benitez alleged that he was denied rights to, *inter alia*, a fair trial and due process by the following argument by the prosecution:

> And this is offensive that, in this day and age, that it is still the response you get from defendants in these types of cases. That's horrible.

_____

[30]Ground 1 previously was dismissed.

[31]The Court held that the claims based upon denial of rights to a fair trial and to due process were exhausted on direct appeal but that a claim based upon denial of a right to confrontation was not. #66. The holding that the fair trial and due process claims were exhausted on direct appeal eliminates any need to address respondents' reliance upon a procedural bar applied thereafter on state post-conviction review. The application of a procedural bar on later review does not bar federal consideration of a claim that previously was exhausted and adjudicated on the merits. To the extent that the state supreme court applied a state procedural bar based on a factual premise that the exhausted claims could have been raised on appeal but were not, the court did so in error. To the extent that the state supreme court applied a bar against relitigation of previously adjudicated claims, such a rule of law of the case does not give rise to a procedural default on federal review. *See Cone v. Bell*, 556 U.S. 449, 466 (2009)("when a state court declines to revisit a claim it has already adjudicated, the effect of the later decision upon the availability of federal habeas is 'nil'").

-10-

1    . . .

2         You'd have to believe that she is this thirteen-year-old
     mentally retarded, deaf mute temptress. That's the extent of the
3    Defendant's story.  She's this deaf mute retarded temptress.
     She's just encouraging him on to these sexual feats.
4
          And poor Mr. Lopez, he's a gentleman, he wouldn't do
5    anything mean to women, but he couldn't help himself, he's a
     man.
6
          So you would have to believe that deaf, mute, mentally
7    challenged [R.M.], who functions as a [Kindergartener,] knows
     about sex, knows to take her clothes off and spread her legs for
8    him, and then somehow magically he can stand four feet away,
     and I don't know whether they call this the marksmanship defense
9    or what, but magically flying semen flies four to five feet and hit a
     bull's eye right in her vagina, luckily enough for us that it will seep
10   up and kind of explain the physical evidence. (Ex. 10, p. 40.)

11   . . .

12        He also wants to explain the vaginal injury. Oh, yeah, she
     was fingering herself. She's so turned on by Mr. Sexy, Mr. Mario
13   Lopez-Benitez, who she meets in a van, goes inside to get a drink
     with, she's just so overwhelmed that she's got to rip her clothes
14   off, start touching herself, blow kisses at him to get him to
     masturbate on her from five feet away. (Id. at 41.)
15
     . . .
16
          And I ask you, tell Mario Benitez Lopez [sic] that you don't
17   believe this foul, seductive-temptress-masturbation-flying-semen
     story.  That you believe the physical evidence. That you believe
18   the doctor who said the only thing this could have come from was
     a penetrating injury to the vagina consistent with his penis. (Id. at
19   48.)

20   #17, at 10 (amended petition), *quoting* #22, Ex. 10, at 39, 40, 41 & 48.[32]

21        The Supreme Court of Nevada summarily rejected this claim on direct appeal in a

22   closing footnote, concluding that the assignment of error did not warrant relief.[33]

23        The state high court's rejection of the exhausted claims alleged in the amended petition

24   was neither contrary to nor an unreasonable application of clearly established federal law.

25

26   _____

27   [32]The Court quotes verbatim from the amended petition given petitioner's attempted expansion of the
     claim in the reply as discussed *infra*.

28   [33]#22, Ex. 26, at 6 n.5.

-11-

On federal habeas review of a state court conviction for constitutional error, the standard of review for a claim of prosecutorial misconduct, is "'the narrow one of due process, and not the broad exercise of supervisory power'" applied in federal criminal trials. *See, e.g., Darden v. Wainwright*, 477 U.S. 168, 181 (1986)(quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974)). "The relevant question is whether the prosecutor['s] comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Id*. (quoting *Donnelly*, 416 U.S. at 643).

Petitioner nonetheless relies in the main upon: (a) Supreme Court decisions that concern the exercise of supervisory power in federal criminal trials and that make no pertinent constitutional holding;[34] (b) federal court of appeals cases that similarly concern the exercise of supervisory power in federal criminal trials and that make no pertinent constitutional holding;[35] (c) Supreme Court of Nevada decisions applying state law;[36] and (d) the American Bar Association (ABA) Standards for Criminal Justice.

With regard to Supreme Court cases pertaining to federal criminal trials, the Supreme Court does not exercise supervisory authority over the state courts as it does over the federal courts. The high court can direct the manner in which federal criminal proceedings are conducted even in the absence of constitutional error, but it may not do so with regard to state criminal cases. *See, e.g., Danforth v. Minnesota*, 552 U.S. 264, 289 (2008). Thus, petitioner's citation to Supreme Court cases directed to the exercise of supervisory authority over federal prosecutors is unavailing.

*A fortiori*, the Supreme Court of Nevada clearly is not bound to follow a non-constitutional holding by a federal court of appeals regarding prosecutorial closing argument.

---

[34] *See United States v. Young*, 470 U.S. 1 (1985)(federal criminal proceeding with no application of constitutional doctrine as opposed to review for non-constitutional error, with Justice Brennan's separate opinion emphasizing that the case concerned the application of "the standards by which federal prosecutors must guide their trial conduct"); *Berger v. United States*, 295 U.S. 78 (1935)(similar).

[35] *See* federal appellate cases cited at #65, at 13.

[36] See state supreme court cases cited at #65, at 13. Petitioner incorrectly cites to one decision that is instead found at *Earl v. State*, 111 Nev. 1304, 1311, 904 P.2d 1029, 1033 (1995).

Even if petitioner were to cite a Ninth Circuit case from a federal criminal case that was wholly indistinguishable with respect to the closing argument made, he would not carry his burden under AEDPA. The Supreme Court of Nevada is not a subordinate court to the Ninth Circuit. Nor is this case a federal criminal matter on direct appeal. Even if the Ninth Circuit reached a contrary conclusion on a *constitutional* issue regarding a prosecutor's closing argument, the Supreme Court of Nevada would not be bound to follow that decision, as petitioner instead must demonstrate under AEDPA that the state supreme court's decision was contrary to clearly established federal law as determined by the United States Supreme Court. Petitioner could cite a Ninth Circuit holding from a federal criminal case that was virtually on all fours with the present case, which he in fact has not done, and he would not carry his burden under AEDPA under established law.

With respect to prior holdings by the Supreme Court of Nevada, the state supreme court is the final arbiter of the application of Nevada state law standards to this case, and any *arguendo* violation of Nevada state law standards in any event is not cognizable on federal habeas review. To any extent that the cited state supreme court decisions *arguendo* made constitutional holdings, petitioner's burden under AEDPA again is to demonstrate an unreasonable application of prior *United States Supreme Court* constitutional holdings.

Petitioner's reliance upon the ABA Standards for Criminal Justice similarly is misplaced. ABA standards do not necessarily establish what the Constitution commands. *See, e.g., Jones v. Barnes*, 463 U.S. 745, 753 n.6 (1983). The Supreme Court's citation to an ABA standard in a federal criminal case does not in any sense support a conclusion that the ABA standard constitutes a constitutionally-mandated standard applicable to the states.

Petitioner otherwise cites Supreme Court decisions that state a broad principle of due process framed in such generality that considerable leeway is left in its application to a particular case. As the Supreme Court observed in *Harrington v. Richter*:

> A state court's determination that a claim lacks merit precludes federal habeas relief so long as "fairminded jurists could disagree" on the correctness of the state court's decision. *Yarborough v. Alvarado*, 541 U.S. 652, 664, 124 S.Ct. 2140, 158

-13-

1    L.Ed.2d 938 (2004).   And as this Court has explained,
2    "[E]valuating whether a rule application was unreasonable
     requires considering the rule's specificity. The more general the
3    rule, the more leeway courts have in reaching outcomes in
     case-by-case determinations." *Ibid*. . . . .

4    131 S.Ct. 770, 786 (2011).

5        Petitioner cites *Darden, supra*, for the proposition that "[i]t also is improper for a

6    prosecutor to disparage a defendant or his defense."[37]   Over and above the fact that the

7    *Darden* opinion makes no such explicit statement, the Supreme Court held that the

8    "undoubtedly . . . improper" statements challenged in that case did not give rise to

9    constitutional error.   477 U.S. at 180-81.   Citation to *Darden* thus hardly establishes that it was

10   an objectively unreasonable application of clearly established federal law for the state

11   supreme court to find no constitutional error on the facts of this case.

12       Petitioner further cites to cases that, over and above the generality of their due process

13   discussion, if any, are far, far afield from this case.[38]

14       In sum, other than a passing citation to the broad constitutional principle of *Donnelly*,

15   petitioner essentially argues Ground 2 as if this case were an appeal of a federal criminal

16   case heard on *de novo* review.   This Court repeatedly has rejected similar presentations that

17   in essence have sought to challenge a state court rejection of a constitutional claim regarding

18   a state closing with argument and case authority in the main directed to a challenge to closing

19   argument in a federal criminal trial decided on other than constitutional grounds.[39]   Petitioner

20   has failed to even begin to shoulder his burden under AEDPA of seeking to establish that the

21   _____

22   [37]#65, at 13.

23   [38]*See Romano v. Oklahoma*, 512 U.S. 1, 12 (1994)("whether the admission of evidence regarding
     petitioner's prior death sentence so infected the sentencing proceeding with unfairness as to render the jury's
24   imposition of the death penalty a denial of due process"); *Payne v. Tennessee*, 501 U.S. 808, 825 (1991)(in a
     case considering whether the Eighth Amendment erects a *per se* bar to victim impact evidence by a capital
25   sentencing jury, stating broadly that "[i]n the event that evidence is introduced that is so unduly prejudicial that
     it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a
26   mechanism for relief"); *Duncan v. Louisiana*, 391 U.S. 145, 149 (1968)(in case holding that jury trial is
     available in prosecution for misdemeanor punishable by two years imprisonment, stating broadly that an
27   accused has a fundamental right to a jury trial).

28   [39]*E.g., Obando v. Donat*, 3:08-cv-00565-ECR-WGC, #33, at 8-10.

                                         -14-

1  state court's rejection of his *constitutional claim* was contrary to or an unreasonable
2  application of clearly established federal law *as determined by the United States Supreme*
3  *Court in cases applying pertinent constitutional doctrine*.

4       Petitioner thus would not be able to establish a basis for federal habeas relief even if,
5  purely *arguendo*, the "hard blows" struck by the prosecutor in the closing argument in this
6  case would have resulted in a reversal under the broad standard of review in the exercise of
7  supervisory power.  Petitioner simply has failed to demonstrate that the state supreme court's
8  rejection of his claim under the narrow standard of review instead applicable under the Due
9  Process Clause was contrary to or an unreasonable application of clearly established
10  *apposite* federal law as determined by the United States Supreme Court.

11       In this regard, petitioner urges that the prosecutor's statements "were the only evidence
12  offered that tended to show Rosa Martinez's incompetence."[40]  However, the prosecutor's
13  argument was grounded in evidence actually admitted at trial.[41] Petitioner maintains that the
14  State instead should have introduced expert witness testimony by a psychologist as to R.M.'s
15  mental competence.  The defense essentially fought, and lost, that battle at trial, however.[42]
16  Insofar as petitioner's challenge to the closing argument is concerned, the prosecutor was not
17  required to shy away from arguing evidence admitted over defense objection merely because
18  the defense had argued that the evidence was improperly admitted or inadequate.

19       On the showing and argument made, the Court therefore holds that petitioner has
20  failed to demonstrate that the state supreme court's rejection of his constitutional claims in

21

22      [40]#17, at 11.

23

24      [41]See text and record citations, *supra*, at 2 & 5-6.  Moreover, the prosecutor's argument with regard
to R.M.'s mental competence accords with the state supreme court's recital of the trial evidence on direct
appeal. See #22, Ex. 26, at 1.  The state supreme court's summary of the evidence is presumed to be correct
25  unless petitioner shows by clear and convincing evidence that the contrary is true.  *See,e.g., Sims v. Brown*,
425 F.3d 560, 563 n.1 (9th Cir. 2005).  Petitioner has not done so here.  Mere argument that the State instead
26  should have presented expert psychological testimony does not negate the existence of the evidence actually
introduced at trial, short of obtaining a ruling that the evidence was not properly admitted, which petitioner has
27  not obtained to date via a timely and exhausted claim.

28      [42]See #20, Ex. 6, at 24; *id.*, Ex. 7, at 12-16 & 53.

Ground 2 that were exhausted and actually raised in the amended petition was either contrary to or an unreasonable application of clearly established federal law.

Petitioner further seeks to raise a new claim in the reply that was not presented in Ground 2 in the amended petition. It appears that petitioner is seeking to graft onto Ground 2 a claim that is based upon a ground that the Court held is time-barred.

As backdrop, the Court held that Ground 1 did not relate back to a timely-filed claim and thus was time-barred. In Ground 1, as amended, petitioner alleged that he was denied rights to a fair trial and confrontation under the Sixth and Fourteenth Amendments when the testimony of the victim was admitted as a demonstrative exhibit seeking to demonstrate that the victim was unable to communicate sufficiently to give consent to sexual activity with petitioner. The Court held that Ground 1 did not relate back to a claim in the original petition and therefore was untimely.[43]

In the reply, petitioner added new factual allegations to Ground 2 referring to entirely different portions of the State's closing from the portions quoted and challenged in Ground 2 in the amended petition. As outlined *supra*, in Ground 2 of the amended petition, petitioner based the claim on the prosecutor's comments challenging Lopes-Benitez' account of the events maintaining that the victim engaged in consensual sexual activity. In the reply, in contrast, petitioner sought to premise the claim in addition on entirely different portions of the argument in which petitioner contends that the prosecutor improperly testified, by way of his closing argument, as to the victim's mental capacity.[44]

---

[43]#63, at 17.

[44]Compare text, *supra*, at 10-11 with #65, at 13-14 (reply). The new portions of the argument relied upon are presented in the reply as a single passage with no omissions, with a single record cite. When the Court turned to the supporting record cite, however, it found that the material quoted was not from the actual closing argument but instead was from a state appellate brief. The material quoted in the reply in truth comes from three different portions of the closing argument, and relevant material is omitted. For example, critically, the prosecutor states immediately after an assertion that the victim was incapable of giving consent: "You saw her on the stand." #22, Ex. 10, at 17; see also *id.*, at 10-11 & 13. The prosecutor thus was referring the jury to what they observed at trial in support of his argument, not making a bald testimonial statement. Such presentation in the reply in this Court without citation to the actual closing argument, without any indication
(continued...)

1    Petitioner thereafter presents the substantive legal argument that would have been

2    presented in support of Ground 1 had it not been dismissed as untimely.  That is, petitioner

3    urges that the victim improperly was placed on the stand as a demonstrative exhibit without

4    a meaningful opportunity for the defense to conduct cross-examination.[45]  Petitioner then

5    seeks to tie in these added new factual allegations and this new substantive argument to

6    Ground 2 as it was alleged in the amended petition.  Petitioner urges that the alleged error

7    from referring to the victim's testimony in closing argument was "compounded by the

8    prosecutor's repeated disparaging remarks by [sic] Lopes' testimony, which was the only

9    affirmative evidence counsel presented in his defense."[46]

10    At the outset, to the extent that this new claim that petitioner seeks to append to

11    Ground 2 in the reply relies upon the Confrontation Clause, the claim in all events no longer

12    is before the Court.  Petitioner has abandoned any Confrontation Clause claims in Ground

13    2 following upon the Court's holding that such claims are unexhausted.[47]

14    To the extent that this new appended claim instead relies upon an alleged denial of

15    petitioner's rights to due process and a fair trial, petitioner may not use the federal reply to

16    amend the petition.  *See,e.g., Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir.1994).

17    The only way to add what in truth is a new claim to Ground 2 is by a properly-filed amended

18    petition.  At this juncture, under Rule 15(a) of the Federal Rules of Civil Procedure, petitioner

19    can amend the petition only with respondents' written consent or by obtaining leave of court

20    to amend.  Significantly, neither was obtained, despite repeated rejections by this Court of

21

22    [44](...continued)
      that the quoted material comes from different locations in the closing argument, and without even an ellipsis

23    reflecting that material has been omitted, is not favored.  Counsel needs to exercise, at the very least, more
      care in representing the content of the state court record to the Court.

24    [45]#65, at 14-15.

25    [46]*Id.*, at 15.

26

27    [47]See ## 67-68.  The Court notes that the restated Ground 2 in these filings does not include the new
      claim appended to Ground 2 in the reply.  However, petitioner never had included the appended new claim in

28    the amended petition in the first instance, so the restatement of Ground 2 does not necessarily reflect an
      intention to abandon the strategy of seeking to expand the claim "through the back door" in the reply.

1    similar attempts by the Federal Public Defender in prior habeas cases to *de facto* amend the

2    petition by adding claims in the reply.  Of course, at this juncture, petitioner would face a

3    steep hill in seeking to demonstrate on a motion for leave that such amendment would not

4    be futile due to lack of exhaustion and/or untimeliness.[48]

5         In this regard, it is established law that federal habeas pleading is not notice pleading.

6    A petitioner instead must allege the operative facts upon which he bases his claim with

7    particularity in the petition.  *E.g., Mayle v. Felix*, 545 U.S. 644, 655-56 (2005).  The operative

8    facts of the new appended claim were not alleged in Ground 2 in the amended petition, which

9    was prepared by counsel.  Absent grant of a motion for leave to amend, the appended claim

10   is not properly before the Court.

11        Petitioner may not circumvent the Court's prior order dismissing Ground 1 as untimely

12   by appending essentially a recast version of the claim to another claim in the reply.  Petitioner

13   instead must "come in through the front door" by either overturning the prior holding on

14   appeal, presenting a viable basis for reconsideration of the prior order, and/or establishing a

15   viable basis for amendment of the pleadings to add the recast claim.

16        Ground 2 does not provide a basis for federal habeas relief.

17   ### *Ground 3(A)(1): Effective Assistance of Trial Counsel – Investigation of Denial*

18        In Ground 3(A)(1), petitioner alleges that he was denied effective assistance of trial

19   counsel when counsel allegedly failed to investigate his claim that he did not sexually assault

20   the victim.  Petitioner alleges principally that counsel failed to investigate the consistency

21   between his testimony that the victim allegedly removed and neatly folded her clothing and

22   her mother's testimony that she folds her clothes when she undresses.

23        / / / /

24

25        [48] The facts of the appended claim were not presented to the state supreme court as a factual basis
for the claim when the claim corresponding to Ground 2 was presented in the state courts.  It is established
26   law that the petitioner must present the state courts with both the operative facts and the federal legal theory
upon which his claim is based.  *E.g., Castillo v. McFadden*, 399 F.3d 993, 999 (9th Cir. 2005).  The operative
27   facts of the appended claim were not presented to the state supreme court when the claim corresponding to
Ground 2 was presented to the state courts.  The Court previously held that the operative facts at least of
28   Ground 1 – which undergird the appended claim – did not relate back to a timely-filed claim. #63, at 17.

1    After stating the governing legal standard, the Supreme Court of Nevada rejected the

2    claim presented to that court on the following basis:

3    　　Lopez-Benitez first argues that his counsel was ineffective
     for failing to adequately investigate his claim that he did not
4    sexually assault R.M. Specifically, he contends that counsel did
     not focus on Lopez-Benitez's testimony that after R.M. removed
5    her clothes she folded them.  However, he does not explain what
     additional effort counsel should have undertaken to pursue this
6    point or how focusing the jury's attention on this evidence might
     have changed the result of the trial. Moreover, Lopez-Benitez's
7    testimony in this regard simply tracked the earlier testimony by
     R.M.'s mother that R.M. always folded her clothes after removing
8    them.  Therefore, we conclude that he failed to demonstrate that
     the district court erred in denying this claim without an evidentiary
9    hearing.

10   #24, Ex. 55, at 3.

11    The state supreme court's rejection of this claim was neither contrary to nor an

12   unreasonable application of clearly established federal law.

13    On a claim of ineffective assistance of counsel, a petitioner must satisfy the

14   two-pronged test of *Strickland v. Washington*, 466 U.S. 668 (1984).  He must demonstrate

15   that: (1) counsel's performance fell below an objective standard of reasonableness; and (2)

16   counsel's defective performance caused actual prejudice.  On the performance prong, the

17   issue is not what counsel might have done differently but rather is whether counsel's

18   decisions were reasonable from his perspective at the time.  The  court starts from a strong

19   presumption that counsel's conduct fell within the wide range of reasonable conduct.  On the

20   prejudice prong, the petitioner must demonstrate a reasonable probability that, but for

21   counsel's unprofessional errors, the result of the proceeding would have been different.  *E.g.,*

22   *Beardslee v. Woodford*, 327 F.3d 799, 807-08 (9th Cir. 2003).

23    While surmounting Strickland''s high bar is "never an easy task," federal habeas review

24   is "doubly deferential" in a case governed by the AEDPA.  In such cases, the reviewing court

25   must take a "highly deferential" look at counsel's performance through the also "highly

26   deferential" lens of § 2254(d).  *Pinholster*, 131 S.Ct. at 1403 & 1410.

27    In the present case, even following review of the federal reply, this Court is no more

28   edified than was the Supreme Court of Nevada as to "what additional effort counsel should

have undertaken to pursue this point or how focusing the jury's attention on this evidence might have changed the result of the trial."[49]   In the reply, petitioner states only conclusorily that "[c]ounsel should have investigated and addressed this consistency [i.e., her alleged folding of her clothes] in Lopes' testimony."[50]   Petitioner does not identify what action steps counsel should have taken to investigate this consistency – which was reflected in the trial testimony – and what material exculpatory evidence would have been developed through such investigation.   Petitioner's denial of the assault was based on his account of the events while he and the deaf-mute victim allegedly were alone in his apartment.   Short of there actually having been either a video recording of what transpired in Lopes-Benitez' room at the time or a mystery observer hiding in a closet, the Court simply cannot conceive of either how trial counsel could have further "investigated" his denial of a sexual assault or what forensic evidence possibly could have been uncovered that would have corroborated his assertion that the victim folded her clothes at the time.

Petitioner maintains that the mother's testimony that R.M. folded her clothes "confirmed" Lopes-Benitez' defense.[51]   Petitioner's argument ignores the order in which the testimony was given.   The mother testified first, in the State's case-in-chief.   Lopes-Benitez had given no external statement at that time that R.M. had undressed in his apartment and folded her clothes.   He had told the police instead that he only had given her a ride to her home after picking up the minor child from in front of an elementary school.[52]   The mother's testimony therefore in no sense "confirmed" a prior consistent account given by Lopes-Benitez.   Petitioner of course was present in court during the trial and listened to the mother's testimony before then giving his second, different account of the incident on the stand in his own case.   E.g., #21, Ex. 9, at 67-68.

---

[49]#24, Ex. 55, at 3 (order of affirmance).

[50]#65, at 16.

[51]E.g., #17, at 12; #65, at 22.

[52]See text and record citations, *supra*, at 4 & 8; #21, Ex. 9, at 81.

1    The alleged clothes folding thus was hardly the rock upon which the State's case would

2    crash, founder, and sink.  If defense counsel had further "addressed" the point in some

3    unspecified manner as petitioner urges that he should, counsel reasonably probably would

4    have generated a ready and effective retort from the State.  The prosecution quite likely would

5    have responded that Lopes-Benitez had told the police one thing prior to there being a DNA

6    report but then told the jury an entirely different story after the DNA evidence established that

7    his sperm was recovered during the sexual assault exam.[53]  His change in story led to a not

8    implausible potential inference that he lied to the police, or lied to the jury, or both.  The State

9    quite powerfully could suggest to the jury in response that the only consistency in Lopes-

10   Benitez' differing accounts was an effort to avoid or diminish culpability, however inartfully,

11   within the changing framework of what he then knew of the evidence against him.  The

12   allegedly "confirming" fact of the victim's clothes folding was readily dismissed as a *post hoc*

13   embellishment on a story given by Lopes-Benitez only after hearing all of the State's

14   evidence, including the mother's testimony.  A different case perhaps would have been

15   presented if Lopes-Benitez had told the police about the alleged clothes folding in his initial

16   cover story and *before* hearing the mother's testimony.  But this case is not that case.

17   Especially under the applicable doubly deferential standard of review, the state high

18   court's rejection of this claim was neither contrary to nor an unreasonable application of

19   *Strickland*.[54]

20   Ground 3(A)(1) thus does not provide a basis for habeas relief.

21

22   _____

     [53]The report of the DNA analysis was issued approximately a month after the incident. #21, Ex. 8, at

23   55.  Lopes-Benitez of course confirmed on the stand that the semen recovered from the victim was his,
     without any qualification as to the locations from which his semen was recovered.  See #21, Ex. 9, at 93-94.

24

     [54]This conclusion follows with even greater force as to petitioner's vague assertions in the federal

25   reply that counsel "failed to investigate and develop the inconsistencies and conflicting evidence" and that
     "[c]ounsel failed to develop other consistencies in Lopes' testimony."  There is no notice pleading, much less

26   notice argument, on federal habeas review; and these vague assertions would not have stated a claim for
     federal habeas relief even if included in the amended petition rather than the reply.  The Court further notes

27   that the claim exhausted in the state courts was a claim for failure to *investigate*.  Alleging that trial counsel
     should have argued or presented the issue differently at trial – in some as-yet unspecified fashion – goes

28   beyond a claim of a failure to investigate.

***Ground 3(A)(1)(a): Effective Assistance of Trial Counsel – Investigation of Victim***

In Ground 3(A)(1)(a), petitioner alleges that he was denied effective assistance of trial counsel when counsel allegedly failed to investigate the victim's mental capacity and ability to communicate, including: (i) failing to challenge testimony by the victim's mother in which the mother allegedly "was permitted to speculate that her daughter had been assaulted - not because [R.M.] told her - but because [R.M.] indicated pain while urinating;" (ii) failed to investigate or conduct interviews regarding the victim's ability to communicate through rudimentary signs; and (iii) failed to argue that the victim's affect after the incident was inconsistent with that of a victim and failed to argue that Lopes-Benitez' actions after the incident were indicative of innocence.[55]

The state supreme court rejected the claims in that court on the following grounds:

> Lopez-Benitez next contends that his counsel failed to investigate R.M.'s mental capacity and ability to communicate. First, he asserts that his counsel was ineffective for inadequately challenging the testimony of R.M.'s mother as she was the only person who testified that R.M. was sexually assaulted. Specifically, he points to the mother's testimony that she thought maybe R.M. had been raped. However, counsel objected to this testimony. Lopez-Benitez does not sufficiently explain what further action he desired his counsel to undertake in this regard. We conclude that the district court did not err in summarily denying this claim.
>
> Lopez-Benitez further argues that counsel did not investigate or conduct interviews regarding R.M.'s ability to communicate. However, he does not identify with whom the desired interviews should have been conducted or what material evidence they might have produced. We conclude that the district court did not err in denying this claim without conducting an evidentiary hearing.
>
> Lopez-Benitez asserts that his counsel was ineffective for failing to argue that R.M.'s affect after her encounter was not

---

[55]Both counsel have referred to the sundry claims of ineffective assistance of trial counsel under multiple different subheading or subpart designations, because counsel use term-paper style subheadings in their filings with different roman-numeral subheadings than used for the claims themselves. The Court uses the subheading or subpart designations for the claims used originally in the amended petition. While Ground 3(A)(1)(a) was presented initially as a subpart of Ground 3(A)(1), the claims have been argued by the parties largely independently of one another. The Court also notes that a claim that trial counsel failed to "challenge" or "argue" a point differently is distinct from a claim that counsel failed to "investigate" an issue. It would appear, however, that the claims were presented in a similar manner to the state supreme court.

1
2
3
4
5
6
7

consistent with that of a girl who had just been raped and that his actions in willingly driving R.M. home, allowing the police to enter his home, and staying with the police until his arrest later in the evening were indicative of innocence. Counsel did not highlight this evidence in closing argument. Rather, counsel focused his argument on challenging the sufficiency of the State's evidence, an argument that was successful to the extent Lopez-Benitez was acquitted of kidnapping. We conclude that there was no reasonable probability that the result of his trial would have been different had counsel engaged in Lopez-Benitez's suggested argument. Consequently, we conclude that the district court did not err in summarily denying this claim.

8    #24, Ex. 55, at 3-4.

9
10    The state supreme court's rejection of these claims was neither contrary to nor an unreasonable application of *Strickland*.

11    Just as with federal habeas pleading, a Nevada state post-conviction petition must be
12    supported by specific factual allegations.  *See,e.g., Hargrove v. State*, 100 Nev. 498, 502-03,
13    686 P.2d 222, 225 (1984).  Alleging merely that trial counsel failed to pursue an avenue of
14    investigation without also presenting specific factual allegations tending to establish that such
15    investigation in fact would have yielded material exculpatory evidence does not establish a
16    basis either for an evidentiary hearing or for relief.  Similarly, alleging that counsel failed to
17    further challenge objected-to testimony in some additional unspecified fashion fails to present
18    a basis either for an evidentiary hearing or relief.  Nor does merely alleging that defense
19    counsel should have placed more emphasis on evidence that in fact was before the jury.

20    Turning to the particular portions of the claim, petitioner's allegation that the mother
21    was permitted to speculate that her daughter had been assaulted because she indicated pain
22    while urinating is belied by the record.

23    Petitioner alleges that this testimony occurred in the following manner :

24
25
26
27

[R.M.] never communicated that Lopes sexually assaulted her. No expert was consulted by the defense or the State in an attempt to communicate with [R.M.]. Instead, her mother was permitted to speculate that her daughter had been assaulted - not because [R.M.] told her - but because [R.M.] indicated pain while urinating. (Ex. 6, pp. 94, 47.) Trial counsel did not object to the mother's speculation of an assault.

28    #17, at 13 (amended petition); see also #65, at 17-18 (same representation in reply).

-23-

At trial, the mother testified, first, that she told her son Jesus – as she was getting him to switch places with her in the van to make sure that Lopes-Benitez drove the van to the house where the police were – that "[h]e did something to [R.M.]." This obviously occurred before R.M. went with her mother into the bathroom and urinated because they were not even back at the house yet. There is nothing, absolutely nothing, on page 47 of the transcript involving R.M. reporting pain while urinating – as a basis for speculation or otherwise – because that event had not even occurred as of the time that the mother made the statement to Jesus. Furthermore, defense counsel *did* object to the mother's speculative statement to Jesus, the objection *was* sustained, and the testimony *was* stricken as speculative.[56]

Nearly 50 pages later in the trial transcript, at page 94, the victim's mother testified that R.M. indicated pain to her while urinating. There is no testimony in the portion of the transcript cited by petitioner in support of this claim by the mother speculating that R.M. was sexually assaulted because R.M. indicated pain while urinating. The mother testified – only – that R.M. indicated pain while urinating.[57]

This attempted splicing together of widely-separated testimony – regarding events clearly separated by time – in an effort to present a witness as saying something that she did not in fact say is not persuasive. Basing argument on a mischaracterization of the record is singularly unpersuasive. Furthermore, the speculative prior statement that the witness did make, albeit not as represented herein, was objected to by counsel and was stricken. The mother's testimony that R.M. reported pain clearly was admissible. N.R.S. 51.105(1).

This first portion of the claim thus is wholly baseless as it indisputably is refuted by the state court record.

The second portion of the claim was not supported by specific factual allegations in the state courts tending to demonstrate prejudice. Petitioner alleged only conclusorily that counsel should have investigated or conducted interviews regarding the victim's ability to

---

[56]#20, Ex. 6, at 47; see also text, *supra*, at 3-4 (chronology of events).

[57]#20, Ex. 6, at 94.

communicate.  However, allegations, for example, only that counsel "should have interviewed or consulted with a mental health specialist or doctor, [R.M.'s] teachers, social workers, and language specialists that worked with [R.M.]"[58] allege only what counsel failed to do, not resulting prejudice.  Such allegations do not present facts tending to establish that such interviews in fact would have developed material exculpatory evidence.

In the third portion of the claim, petitioner alleges that counsel was ineffective for failing to argue that the victim's affect after the incident was inconsistent with that of a victim and failing to argue that Lopes-Benitez' actions after the incident were indicative of innocence.

With regard to the victim's affect, petitioner ignores trial evidence that completely undercuts the argument.  R.M.'s mother testified not that R.M. was in a generally happy state when she exited the van.  She instead testified that R.M. was happy *to see her*.  Even worse for the defense, Sandra Mariscal testified that R.M. was in a generally sad state when she exited the van and further that she made her sign for pain while pointing to her private area and then to Lopes-Benitez.[59]  If defense counsel had hinged his closing argument in any significant respect on R.M. allegedly not having the affect of a victim after the incident, he only would have provided the State with an opportunity to emphasize significant evidence against Lopes-Benitez while shooting down a defense argument that was belied by the trial evidence. The state supreme court's rejection of this portion of the claim clearly was neither contrary to nor an unreasonable application of *Strickland*.

With regard to his own actions allegedly indicative of innocence, petitioner maintains that he "willingly drove [R.M.'s] brother back to the family residence," "willingly took the police to his home to produce his identification," and "voluntarily stayed with the police until his arrest later that night." #17, at 14.

---

[58]*Cf.* 65, at 19, lines 10-12 (federal reply).

[59]See text and record citations, *supra*, at 3.  All this testimony followed upon testimony by the mother and Mariscal that they heard R.M. scream when they initially saw the van.  While the victim's scream was subject possibly to different interpretations, an inference adverse to the defense was reinforced by the testimony that followed by the mother and Mariscal.

1      However, the evidence at trial instead supported an inference that Lopes-Benitez in

2    truth was not being given much of a choice after the family ran his van down with the police

3    nearby.  R.M.'s mother got up into the van without asking after first thanking and then

4    confronting Lopes-Benitez, started directing petitioner to drive to her house where the police

5    were, and then had her adult son take over from her to make sure that Lopes-Benitez drove

6    to the house.  As Jesus testified, if Lopes-Benitez had not complied there would have been

7    a fight, all with the police nearby within hailing distance.  Any inference that Lopes-Benitez

8    instead drove to the house where the police were wholly of his own volition was a quite

9    tenuous one indeed.[60]

10      Similarly, there was no testimony elicited from a police officer that Lopes-Benitez was

11    fully free to leave but instead willingly and voluntarily stayed to assist the officers.  As

12    petitioner's counsel no doubt is aware, a suspect can be not free to leave even prior to being

13    formally "under arrest."  None of the testimony cited by petitioner affirmatively establishes that

14    he could have left at any time after first interacting with the police officers but himself chose

15    to stay.  His own self-serving testimony at trial clearly did not conclusively establish such.[61]

16      The lead officer instead testified that, upon being advised by the family that they had

17    found R.M. and that the suspect that they had found her with was in the van, he radioed the

18    officer at the house to "hold that van."[62]  It would be a highly unlikely inference that the police

19    were going to "hold that van" but let a suspect – particularly one who was driving with no

20    identification -- leave of his own accord.  An officer thereafter remained with the van – and

21    with Lopes-Benitez – at all times, with the custodial officer specifically turning custody over

22    to another officer before moving to another task.[63]

23      / / / /

24

25    [60]#20, Ex. 6, at 45-51, 93-94 & 98-99 (would have yelled to police); Ex. 7, at 49-51; *cf.* Ex. 6, at 18.

26    [61]Petitioner relies upon: #20, Ex. 6, at 50; *id.*, Ex. 7, at 112-14; and #21, Ex. 9, at 61-62 & 64.

27    [62]#20, Ex. 7, at 81.

28    [63]*Id.*, at 84-85; see also #21, Ex. 9, at 103 ("we [*i.e.*, the police] decided to go get his identification").

1   Any inference of innocence from Lopes-Benitez being directed by an adult male family

2   member to the house and then not trying to leave arguably readily apparent police custody

3   thus was marginal at best.  Moreover, the undisputed fact that Lopes-Benitez then lied to the

4   police about the incident utterly negated any such marginal inference of innocence.  Lying to

5   the police is not "action indicative of innocence" but instead supports a strong inference of

6   culpability.  Remaining silent of course supports no such inference, but lying to the police in

7   an effort to cover up an incident does strongly support such an inculpatory inference.[64]

8   Accordingly, arguing that petitioner's actions were indicative of innocence merely was

9   another exceedingly weak argument that then left the defense open to a strong comeback

10  argument by the State.  The state supreme court's rejection of this portion of the claim thus

11  also clearly was neither contrary to nor an unreasonable application of *Strickland*.

12  Petitioner urges that he sustained prejudice on these claims because "he was denied

13  his right to have competent counsel represent his interests during this vital stage of the

14  proceedings."[65]  *Strickland*, however, requires a petitioner to demonstrate instead that there

15  was a reasonable probability that, but for counsel's alleged deficient performance, the *result*

16  *of the proceeding* would have been different.  Arguing the prejudice issue under an

17  inapplicable standard that would collapse the prejudice inquiry into the deficient-performance

18  inquiry is unpersuasive.

19  On the allegations and evidence before the state courts, and under the applicable

20  doubly deferential standard of review, petitioner has failed to demonstrate that the state

21  supreme court's rejection of these claims was contrary to or an unreasonable application of

22  clearly established federal law.

23  Ground 3(A)(1)(a) therefore does not provide a basis for federal habeas relief.

24  / / / /

25  / / / /

26  _____

27  [64]Petitioner's flimsy "explanation" for why he lied to the police is discussed, *supra*, in n. 27.

28  [65]#65, at 20, lines 16-17.

***Ground 3(A)(1)(b): Effective Assistance of Trial Counsel – Sperm Cells and DNA***

In Ground 3(A)(1)(b), petitioner alleges that he was denied effective assistance of trial counsel when counsel allegedly failed to "investigate or inquire" into the location of sperm cells and DNA evidence.[66]

As outlined in the factual recital, DNA from sperm cells recovered from the inner lining of the victim's underwear matched Lopes-Benitez' DNA.  Analysis of the DNA of sperm cells recovered from dried seminal fluid on her body outside her vagina did not exclude Lopes-Benitez.  Analysis of the samples recovered from internal vaginal swabs were positive for the presence of semen, but the DNA analysis was inconclusive as to this sample because too few sperm cells were recovered by the swabs to produce DNA test results.[67]

Petitioner alleges that counsel failed to "investigate the location of the sperm cells and the DNA evidence" in some unspecified fashion; failed to "address the DNA testimony in the context of the mother's inappropriate testimony" "that she believed her daughter had been raped," again with the manner of "addressing" the testimony being unspecified; and failed to question the examining physician as to "whether the small number of sperm cells in the vaginal cavity could be explained by a masturbating woman transferring semen from a male's ejaculating onto her."[68]

/ / / /

---

[66]Respondents suggest in the answer that the Court held that this claim was time-barred.  However, the Court held that Ground 3(B), not Ground 3(A)(1)(b) was untimely.  See #63, at 19-20.  This particular claim was Ground 3(A)(1)(b) in the amended petition.

[67]See text and record citations, *supra*, at 5.  Petitioner alleges that "[t]he only semen identified as belonging to Lopes was located on the cotton lining of [R.M.'s] underpants." #17, at 14.  This is a correct recital of the DNA analysis.  Analysis of the underwear lining sample provided a positive match; analysis of the dried seminal fluid sample did not exclude Lopes-Benitez; and analysis of the internal swab sample was inconclusive.  However, when Lopes-Benitez testified – against the advice of defense counsel – he confirmed that the semen recovered from the victim was his, without any qualification as to the locations from which his semen was recovered.  See #21, Ex. 9, at 93-94.  Lopes-Benitez of course had a constitutional right to take the stand against the advice of counsel.  However, the testimony that he gave when he did so largely precluded any argument – whether by defense counsel or by federal habeas counsel – seeking to maintain that the semen recovered was not his.

[68]#17, at 14-15.

-28-

The state supreme court rejected the claims in that court on the following grounds:

> Lopez-Benitez also argues that counsel failed to adequately investigate the location of the sperm cells and DNA found in R.M.'s vaginal cavity. The evidence showed that the amount of sperm found inside R.M's vagina was too small to conclusively establish the donor. Further, Lopez-Benitez's semen was found on the outside of R.M.'s vaginal cavity and her clothing. Counsel challenged the admission of some of the DNA evidence and cross-examined the State's DNA expert about his findings. Lopez-Benitez does not identify what further investigation he desired his counsel undertake. Consequently we conclude that Lopez-Benitez fails to demonstrate that the district court erred in summarily denying this claim.

#24, Ex. 55, at 3-4.

The state supreme court's rejection of these claims was neither contrary to nor an unreasonable application of *Strickland*.

The testimony of the examining physician, Dr. Michael Zbiegien, M.D., was incompatible with petitioner's theory that the victim introduced sperm into her vagina that had been ejaculated onto her body by Lopes-Benitez by herself masturbating. The vaginal swabs were taken deep in the vagina, "as far up into the vagina as comfortable to the patient," and were approximately six inches long.[69] This location tended to be inconsistent with petitioner's victim masturbation theory. Further, there was a fresh hymenal tear, bleeding, and bruising at the six o'clock position on the virginal patient that was consistent with penile penetration.[70] Dr. Zbiegien opined that the hymenal tear would not have resulted from self-infliction because "[i]t's quite painful when [the] hymen gets torn."[71] The physician further rejected the efforts that defense counsel did make to suggest that the semen recovered from the victim's vagina

---

[69]#21, Ex. 9, at 38-39.

[70]*Id.*, at 15-20, 25-27 & 31-33.

[71]*Id.*, at 28-29 & 30-31.  Dr. Zbiegien did not rule the possibility that "a" finger rather than a penis could have caused the hymenal tear and bruising, although that was not his conclusion as to what occurred. *Id.*, at 19 & 29.  However, acceding that "a" finger could have caused the injury is not the same as positing that *the victim* self-inflicted the injury with *her own* finger, particularly during alleged masturbation, given the pain that such a self-infliction of injury would cause.

might have originated first from ejaculate onto her body.[72]  In his medical opinion, there was no other conclusion that explained the entirety of his observations -- including the hymenal tear and bruising -- other than penetration and ejaculation.[73]

It not only is speculative, but further is not reasonably likely given the physician's other testimony, that trial counsel would have secured a response favorable to the defense if counsel had asked Dr. Zbiegien directly whether the victim could have introduced the semen into her vagina through masturbation.  However, even more to the point, petitioner's victim-masturbation theory does not explain the tearing and bruising of the hymen, given that Dr. Zbiegien ruled out self-inflicted injury.  Against the backdrop of the testimony at trial, the state supreme court's rejection of this claim clearly was not an objectively unreasonable application of *Strickland*.

The state supreme court's rejection of petitioner's vague claims that trial counsel additionally should have further investigated or "addressed" the forensic testimony regarding DNA and sperm cells in some as-yet unspecified fashion also was neither contrary to or an unreasonable application of *Strickland*.

This conclusion follows with even greater force regarding the claim based upon counsel's failure to "address" the DNA testimony, also in as-yet unspecified fashion, "in the context of" the mother's testimony that she believed her daughter had been raped.  Petitioner points to page 34 of the transcript of the mother's testimony.  She testified there – regarding the time shortly after they had found out that R.M. was missing and family members and friends were starting the search – that she began to cry because "I thought that maybe she had been raped."  Defense counsel – immediately – objected.  The court sustained the objection, struck the testimony, and instructed the jury to not join in such speculation.  The court made the percipient admonition that the jury simply could take into account that the mother was upset following upon her daughter being missing. #20, Ex. 6, at 35-35.

---

[72]*Id.*, at 29-30 & 35-39.

[73]*Id.*, at 39.

1    This Court is at a loss as to how this remark – which immediately was objected to, was

2    struck, and resulted in an instruction to the jury – had the irrevocable prejudicial impact that

3    petitioner attributes to it.  The mother's statement that "I thought that maybe she had been

4    raped" was made regarding a point in time when all that she then knew was that her daughter

5    was missing.  The statement in truth reflected nothing more than the depth of feeling of a

6    mother's concern for a missing daughter.  She clearly was making no statement that she then

7    knew facts that her daughter had been raped or, more to the point, that the then as-yet unmet

8    Lopes-Benitez had committed an offense.  Juries – as well as reviewing courts – have the

9    basic common sense to appropriately discount  such an expression of the depth of feeling of

10   a mother's concern as in truth having no probative value.  The jury in this case in any event

11   was instructed to disregard the remark and to only consider that she was upset.

12   The Court further is at a loss as to how trial counsel could have or should have

13   "addressed" the DNA evidence "in the context" of the mother's statement.  Again, counsel

14   immediately objected to the remark, which was stricken with an instruction to the jury.  The

15   Court cannot fathom what counsel could have or should have done vis-à-vis the DNA

16   evidence that further would have addressed a remark that he already had objected to, that

17   had been stricken, and as to which the jury had been instructed to disregard.  Further to the

18   point, petitioner has not identified what counsel should have done in this regard that would

19   have had a reasonable probability of altering the outcome at trial.

20   Ground 3(A)(1)(b) does not provide a basis for federal habeas relief.

21   ***Ground 3(C)(1): Effective Assistance of Trial Counsel – Adequate Defense***

22   In Ground 3(C)(1), petitioner alleges that he was denied effective assistance of trial

23   counsel when counsel allegedly failed to present an adequate defense at trial by failing to

24   present witnesses or evidence supporting a claim of consensual sexual conduct.

25   The state supreme court rejected the claim presented to that court on the following

26   grounds:

27                   Lopez-Benitez asserts that his counsel was ineffective for
     failing to adequately present witnesses and evidence to support

28                   his claim that any sexual conduct that occurred with R.M. was

consensual. Lopez-Benitez did not identify any witnesses whom he desired counsel to call.  He claims that counsel overlooked evidence that R.M. removed and folded her clothes and sat on a couch while he masturbated, a clear indication, according to Lopez-Benitez, that R.M. consented to the activity. However, this evidence was presented to the jury. Lopez-Benitez does not explain what further action he desired his counsel to take in this regard.  Consequently, we conclude that the district court did not err in summarily denying this claim.

#24, Ex. 55, at 3-4.

The state supreme court's rejection of this claim was neither contrary to nor an objectively unreasonable application of *Strickland*.

In Ground 3(C)(1), to the extent that the claim has any specificity, petitioner makes essentially the same argument that he made in Ground 3(A)(1) – that counsel should have "addressed" in some unspecified manner the alleged fact that R.M. folded her clothes after allegedly removing them in his home.

The Court's discussion as to Ground 3(A)(1) applies fully here as well.

Petitioner does not specify what else should have been done by counsel to somehow further "address" the alleged folding of the clothes.  Lopes-Benitez' account of the alleged clothes-folding was directed to a time when he and the victim allegedly were alone in his home, so it is difficult to conceive how counsel would have developed evidence corroborating his clothes-folding testimony.  Further, the mother's testimony in truth did not "confirm" Lopes-Benitez' testimony because she testified first and he had given no prior external consistent statement as to any such clothes-folding, or, indeed, as to R.M. even being in his home. Accordingly, if defense counsel had focused on the point in closing argument, the State then only would have further emphasized the fact that Lopes-Benitez had told the police one thing prior to the results of the DNA analysis and the jury quite another thereafter.  The allegedly "confirming" fact of the victim's clothes folding was readily dismissed as an after-the-fact embellishment on a story given by Lopes-Benitez only after hearing all of the State's evidence, including the mother's testimony.  As the Court observed as to Ground 3(A)(1), the alleged clothes folding was hardly the rock upon which the State's case would crash, founder, and sink.  See text, *supra*, at 18-21.

1    Petitioner further urges that he argued in the state courts that counsel was ineffective

2    for failing to call specific witnesses and that he also argued that counsel should have

3    investigated the victim's ability to communicate.  However, in the portions of the briefing cited

4    by petitioner, he in fact argued only that, *e.g.*, counsel should have interviewed "teachers,

5    social workers, or language specialists who, potentially deal with [R.M.] on a daily basis."[74]

6    As the Court noted in the discussion of Ground 3(A)(1)(a), such allegations allege only what

7    counsel failed to do, not resulting prejudice.  Such allegations do not present facts tending

8    to establish that such interviews in fact would have developed material exculpatory evidence.

9    Conclusory allegations as to generic categories of witnesses that should have been

10   interviewed or called along with the bare supposition that they would have provided

11   exculpatory testimony do not present a viable basis for post-conviction relief, in either state

12   or federal court.

13       Petitioner maintains on these claims as well that he sustained prejudice because "he

14   was denied his right to have competent counsel represent his interests during this vital stage

15   of the proceedings."[75]   As the Court also noted regarding Ground 3(A)(1)(a), however,

16   *Strickland* requires a petitioner to demonstrate instead that there was a reasonable probability

17   that, but for counsel's alleged deficient performance, the *result of the proceeding* would have

18   been different.  Arguing the prejudice issue instead under the inapposite standard relied upon

19   essentially concedes that petitioner cannot demonstrate prejudice under the standard that

20   actually applies under *Strickland*.

21       Ground 3(C)(1) does not provide a basis for federal habeas relief.

22       ***Ground 3(D): Effective Assistance at Trial – Alleged Prosecutorial Misconduct***

23       In the exhausted portion of Ground 3(D) that remains, petitioner alleges that he was

24   denied effective assistance when trial counsel did not object to alleged prosecutorial

25   misconduct in the portions of the closing argument challenged in Ground 2.

26   _____

27       [74]#23, Ex. 52, at 8.

28       [75]#65, at 22.

-33-

The state supreme court rejected the claims presented to that court on the following grounds:

> Lopez-Benitez next contends that his counsel was ineffective for failing to object to gross prosecutorial misconduct. Specifically, he argues that the State's closing argument was testimonial in nature, replete with personal opinions and references to legally inadmissible evidence to which his counsel should have objected. Generally, a prosecutor may not interject his personal opinion in closing argument. However, "[s]tatements by the prosecutor, in argument, indicative of his opinion, belief, or knowledge as to the guilt of the accused, when made as a deduction or conclusion from the evidence introduced in the trial, are permissible and unobjectionable." Further, "'[a] prosecutor may not argue facts or inferences not supported by the evidence.' Nevertheless, the prosecutor 'may argue inferences from the evidence and offer conclusions on contested issues.'"
>
> We have reviewed the comments Lopez-Benitez contends were improper and conclude that they were, in essence, an explanation to the jury of what the State was required to prove and an argument that it had met its burden of proof. We conclude that the prosecutor's use of personal pronouns constituted permissible argument not improper personal opinion. Accordingly, we conclude that the district court did not err in summarily denying this claim.
>
> Lopez-Benitez further asserts that particular comments made by the prosecutor in closing argument were inflammatory. He argues that the prosecutor's reference to his defense as "horrible" and a "foul, seductive-temptress-masturbation-flying-semen story" was inflammatory and an expression of the prosecutor's personal opinion about the case. A prosecutor may not disparage legitimate defense tactics. "However, where evidence of guilt is overwhelming, even aggravated prosecutorial misconduct may constitute harmless error." Although some of these comments disparaged Lopez-Benitez's defense, we conclude that there is no reasonable probability of a different result even if counsel had objected to them. Therefore, we conclude that the district court did not err in denying this claim without conducting an evidentiary hearing.
>
> Additionally, Lopez-Benitez argues that the prosecutor improperly implied that R.M. did not have knowledge of sexual matters even though there was no testimony to that effect. However, this claim is belied by the record. Counsel had no basis upon which to object to the prosecutor's argument in this regard. Accordingly, we conclude that the district court did not err in denying this claim without conducting an evidentiary hearing.

#24, Ex. 55, at 7-9 (footnotes citing state authorities and rejecting parallel substantive claim as procedurally defaulted omitted).

1    To the extent that the Supreme Court of Nevada held that the prosecutor's argument

2    was not improper under Nevada state law, that is the final word on that issue.  The Supreme

3    Court of Nevada is the final arbiter of Nevada state law.

4    To the extent that the state supreme court held that some of the comments disparaging

5    Lopes-Benitez' defense were subject to meritorious objection under state law, the court's

6    further conclusion that there was not a reasonable probability of a different result at trial was

7    not an objectively unreasonable application of *Strickland*.

8    To the extent that petitioner incorporates the federal law argument presented on the

9    independent substantive claim in Ground 2, the Court's discussion *supra* as to Ground 2 also

10   leads to the rejection of the ineffective assistance claim.[76]

11   As discussed *supra*, petitioner in essence has presented the independent substantive

12   claim in Ground 2 as if he were arguing  a federal criminal case on *de novo* review under the

13   broad standard of review of federal court supervisory power over federal prosecutors.  United

14   States Supreme Court and federal appellate court decisions outlining the requirements

15   applicable to federal prosecutors under that broad standard of review do not define the

16   constitutional limits placed on state prosecutors under the much narrower standard of review

17   under the Due Process Clause.  Nor do ABA standards state constitutional requirements.  As

18   discussed previously, petitioner has failed to demonstrate that the state supreme court's

19   rejection of the independent substantive claim – on deferential AEDPA review – was contrary

20   to or an unreasonable application of clearly established federal law as determined by the

21   United States Supreme Court in apposite cases applying *constitutional* standards.[77]

22   On the ineffective assistance claim in Ground 3(D), petitioner faces an even steeper

23   hill.  He must show not only (a) that the state supreme court's rejection of the underlying

24   constitutional claim was contrary to or an unreasonable application of Supreme Court

25

26   [76]Petitioner apparently is referring to Ground 2 in the reply when he refers to "subclaim (B)(2)."  See
#65, at 23.  Ground 2 is discussed in roman numeral section (B)(2) in the reply.  Elimination of such term-

27   paper roman-numeral organization of the reply eliminates the potential for such confusion.

28   [77]See text, supra, at 10-16.

-35-

1   *constitutional* jurisprudence under the deferential AEDPA standard of review; but also (b) that

2   the state supreme court's determination that there was not a reasonable probability that any

3   failure to object to any *arguendo* constitutionally objectionable argument affected the outcome

4   at trial also was neither contrary to nor an unreasonable application of *Strickland*.  He has

5   failed to demonstrate either herein.

6          The Court further reiterates, as discussed in Ground 2, that the prosecutor's argument

7   as to the victim's capacity was grounded in evidence actually admitted at trial.[78]  The same

8   conclusion holds true with regard to the prosecutor's argument as to the victim's knowledge

9   of sexual matters.[79]  The Constitution, again, does not require that a prosecutor shy away

10  from arguing evidence admitted at trial merely because the defense contends the evidence

11  was improperly admitted or was inadequate.

12         Finally, as with Ground 2, petitioner may not graft the dismissed Ground 1 – concerning

13  the propriety of putting R.M. on the stand as a demonstrative exhibit – onto Ground 3(D) in

14  an effort to circumvent the dismissal of Ground 1.[80]

15  ### Ground 3(F): Effective Assistance at Trial – Failure to Address Request to Withdraw

16         In Ground 3(F), petitioner alleges that he was denied effective assistance of counsel

17  when trial counsel failed to address petitioner's alleged pretrial request to remove trial counsel

18  and appoint new counsel.

19

20         [78]See text and record citations, *supra*, at 15.

21         [79]The trial evidence included the following.  The sign language interpreter testified that R.M. at least

22  linguistically was unable to communicate about sex.  The sexual assault examination physician opined that
    she was a virgin before the incident.  She had not had a boyfriend, and she was under constant supervision

23  at home and at school.  See text and record citations, *supra*, at 2 & 29-30; #20, Ex. 6, at 60-61; and  #21, Ex.
    9, at 119-24.  The prosecutor at one point stated:  "[R.M.] who can't even communicate about sex." #22, Ex.

24  10, at 39.  This argument was supported by the sign language interpreter's testimony.  The prosecutor at
    another point argued to the jury: "So you would have to believe that deaf mute, mentally challenged [R.M.] ,

25  who functions as a kindergartener, knows about sex . . . ." #22, Ex. 10, at 40.  The argument was seeking to
    have the jury draw inferences from the evidence of record, including their own observation of R.M.  The state

26  supreme court's finding that the prosecutor's argument was supported by record evidence is a finding of fact
    that is presumed correct unless overcome by clear and convincing evidence.  Petitioner has not overcome

27  the presumption here.

28         [80]See text, *supra*, at 16-18.

1    The record tendered to the state courts reflected the following.

2    Petitioner's trial was scheduled for Monday, September 17, 2001, as the first case in

3    the trial stack.  In the week prior to the scheduled trial date, the parties engaged in potential

4    plea negotiations.  Lopes-Benitez declined the State's plea offer on September 13, 2001, the

5    Thursday before the then-scheduled Monday trial date.  When the trial judge stated that the

6    case then would proceed to trial on the Monday, defense counsel David Grauman requested

7    that the case instead proceed on the Tuesday, as he would be unavailable on the Monday.

8    The court acceded to the request, while noting that it was leaving all of its Monday trials

9    stacked behind the case.[81]

10    On Tuesday, September 18, 2001, the matter came on for trial, but Grauman was ill

11    that day.  Assistant Public Defender Willard Ewing appeared in Grauman's stead.  The court

12    continued the trial to the next Monday, September 24, 2001, at 1:30 p.m., to allow Grauman

13    sufficient time to recover and be ready for the start of trial.[82]

14    Back at the office, Ewing sent an internal memo to Grauman.  Ewing stated, first, that

15    the judge had continued the trial date to the Monday and that "[t]his is a firm trial date as per

16    the Judge."  He further advised that Lopes-Benitez, "tried to make some comments in court

17    today, but I stopped him until I knew what he wanted to say."  The judge left the bench before

18    Ewing was finished speaking with Lopes-Benitez, such that there was no opportunity to again

19    address the court.  Lopes-Benitez gave Ewing some written statements in Spanish, which he

20    forwarded for translation at the time of his memo to Grauman.[83]

21    / / / /

22

23    [81] #19, Ex. 1, at electronic docketing pages 4-6 (minutes).

24    [82] Id., at electronic docketing page 7.

25
26    [83] #23, Ex. 44, Exhibit 5 thereto.  Petitioner states in the reply that "Lopes wished to address the court
at the hearing but was prevented from doing so by counsel." #65, at 24.  This statement, while true, glosses
27    over the fact that: (a) counsel stopped petitioner from speaking only because he did not know what he was
about to say, in open court with the prosecutor present; and (b) the judge thereafter left the courtroom before
28    counsel finished conferring with petitioner.  The action taken by the pinch-hitting counsel in this regard would
appear to have been fully consistent with competent representation.

-37-

On Wednesday, September 19, 2001, Lopes-Benitez' written statements were translated into English.  The statements were addressed to the judge and the as-yet-not-picked jury.   In the statements, Lopes-Benitez, *inter alia*, referred to an alleged conversation with Grauman on September 13, 2001, which was the Thursday before the then-setting of the trial on Monday, September 17, 2001, and the day on which Lopes-Benitez rejected the State's plea offer.  He maintained that he had given counsel names of witnesses on his behalf.  However, from the remainder of the statements and petitioner's trial testimony, it appears that Lopes-Benitez wanted counsel to call his employer and acquaintances to testify that he was a hard worker and that he respected women.  Lopes-Benitez further maintained that he had asked counsel for the discovery but counsel had not given it to him.  Lopes-Benitez asserted that Grauman spoke harshly to him when he did not accept the State's plea offer and that he then told Grauman that he wanted another attorney.  According to Lopes-Benitez, Grauman responded that there was not enough time before trial to change attorneys and that he was going to represent petitioner at trial even if he did not want him to.[84]

The record presented to the state court does not appear to reflect when Grauman recovered and returned to work during or after the two business days left in the week after he had to miss the scheduled Tuesday, September 18, 2001, trial date.  The record does reflect that, after the trial had commenced, the scheduled third day of trial on September 26, 2011, during voir dire, had to be carried over due to Grauman being ill.[85]

The trial commenced on the reset Monday, September 24, 2001, trial date.[86]

/ / / /

---

[84] #23, Ex. 44, Exhibit 6 thereto; #21, Ex. 9, at 61-64 (related trial testimony).  The statements further included a version of Lopes-Benitez' airborne ejaculate account, at a time well after the issuance of the DNA analysis.  The detailed version of the events did not include any mention of the victim folding her clothes.

[85] #19, Ex. 1, at electronic docketing page 9 (minutes).

[86] In the federal reply, petitioner seeks to push the commencement of the trial on the timeline back to September 27, 2001. #65, at 24.  That is the date that *testimony* began.  The *trial* started, as scheduled, on September 24, 2001, with voir dire.  E.g., #19, Ex. 1, at electronic docketing page 8.  With regard to an issue such as replacement of trial counsel, the September 24, 2001, date that the case was called for jury selection of course is the relevant date.

Petitioner attached with a counseled supplemental state post-conviction petition – filed in 2005 – a document purporting to be handwritten proper person motion to dismiss counsel and appoint alternate counsel.  The document is not file stamped.  It is dated September 24, 2001, above the signature line.  No claim has been made that the document was filed during the time of the trial on or after September 24, 2001.[87]

Lopes-Benitez did not seek to address the court in proper person concerning the representation of his counsel at any point during six full or partial days of court proceedings from Monday, September 24, 2001, through Monday, October 1, 2001.  The record does not reflect any attempt by Lopes-Benitez to request to stop the proceedings to present a purported written motion to dismiss counsel to the court.

On the seventh day of proceedings, October 2, 2011, the State rested.  The court then engaged in the standard colloquy with Lopes-Benitez regarding the decision as to whether to testify, outside the presence of the jury.  After the colloquy and during a lunch break, petitioner indicated his intention to testify, against his attorney's advice.  During the ensuing on-record discussion after the break, Lopes-Benitez stated, *in connection with his anticipated trial testimony*, that he wanted to "explain by myself about the facts," that he had "some papers here," and that he wanted "to read these three papers."  The State immediately interjected that he would have to testify and would not be able to read anything.  The court echoed: "Testify, sir.  I don't know what those papers are."  The court asked defense counsel whether he knew what the papers were, and he responded: "No, I do not, Your Honor."[88]

The prosecutor then stepped out so that the court could continue the discussion with only the defense.  Thereafter, Lopes-Benitez expressed dissatisfaction – on the seventh day of trial, after the State had rested – with the extent to which his attorney had helped him.  The court turned the discussion back to the election to testify, asking Lopes-Benitez whether he was going to take the stand and testify as he had indicated.  Lopes-Benitez responded: "I

---

[87] #23, Ex. 44, Exhibit 7 thereto.

[88] #21, Ex. 9, at 46-47; see also text and record citations, *supra*, at 6.

want to read the papers and to say everything about what happened."  The court asked him whether "those papers in front of you, is that your description of what happened?"  He responded: "Yes.  Yeah, about the attorney and the events."  The court then stated, in the readily apparent context of petitioner's testimony before the jury, that it was not going to let him read papers in his testimony but that he would be allowed to refer to his notes if he forgot anything in his testimony.[89]

After the prosecutor returned, Lopes-Benitez interjected: "This is a motion that I read to, Your Honor."  The court inquired as to what kind of motion it was, to which Lopes-Benitez responded: "Concerning the attorney."  The court told him that the motion was not relevant at that time but that it might be relevant at a later time.[90]

Later, at the November 15, 2001, sentencing, Lopes-Benitez expressed his dissatisfaction with his counsel and stated: "I don't want this attorney anymore."  This statement of course did not constitute a pretrial request to change counsel.  Lopes-Benitez

---

[89]#21, Ex. 9, at 48-50.

[90]#21, Ex. 9, at 50-51.

In the federal reply, petitioner collapses all of the foregoing into the following:

> On September 24, 2001, Lopes prepared a Motion to Dismiss Counsel and Appointment of Alternative Counsel.  (Id., at 7.)  The court denied Lopes' request to present the motion to the court.  (Ex. 9, p. 49-51.)

#65, at 24.

Any implied suggestion that Lopes-Benitez attempted to present a written motion to dismiss counsel to the state court on September 24, 2001, is belied by the record.  Lopes-Benitez did not address the court in regard to any concerns about counsel until *October 2, 2001*, on the seventh day of trial and after the State had rested.  Even then, it is not a foregone conclusion that the motion to which Lopes-Benitez referred at the end of the discussion was a motion to dismiss counsel.  Lopes-Benitez stated only that the motion was "[c]oncerning the attorney."  The state district judge apparently assumed that he was seeking to present a claim of ineffective assistance of trial counsel, which of course would have been premature.  The seventh day of trial would have been an unusual time to file a motion to change counsel, even for a lay defendant.  The document dated September 24, 2001, was not in fact presented for filing until it was presented as an exhibit in 2005.  It hardly is established that the document was the motion to which Lopes-Benitez referred to in 2001.  As the state court record stood on October 2, 2001, during trial, petitioner in fact articulated no request to the state district court to change counsel.  He stated only that he had a motion "concerning counsel."  In all events, nothing occurred in this regard in court on September 24, 2001, at the start of the trial, or over the five court days that followed.

1   received the mandatory sentence of life with the possibility of parole after a minimum twenty

2   years was served.  The state district court stated that it was not the time to address the matter

3   of whether counsel would continue to represent Lopes-Benitez on appeal.[91]

4       The state supreme court rejected the claim presented to that court on the following

5   grounds:

6

7           Lopez-Benitez next argues that counsel was ineffective for
        not presenting to the district court his proper person motion
        requesting dismissal of counsel. Lopez-Benitez asserts that he

8       presented a letter to counsel expressing dissatisfaction with
        counsel and that he prepared a motion to dismiss counsel. It is

9       unclear whether counsel was aware of Lopez-Benitez's motion to
        dismiss counsel. However, even assuming counsel was aware of

10      the motion and was deficient in not advising the district court of it,
        Lopez-Benitez must still demonstrate prejudice. We conclude that

11      he failed to allege sufficient factual allegations demonstrating a
        reasonable probability of success on the motion[FN16] or of a

12      different outcome at trial. Lopez-Benitez's claims in his letter and
        motion that a conflict of interest existed between him and counsel

13      were supported by nothing more than vague allegations that he
        was unhappy with counsel's representation. Consequently, we

14      conclude that he was not entitled to an evidentiary hearing on this
        claim and that the district court did not err in summarily denying

15      it.

16          [FN16] See Young v. State, 120 Nev. 963, 968, 102
        P.3d 572, 576 (2004)(stating that this court

17      considers three factors in reviewing a district court's
        denial of a motion to substitute counsel: "(1) the

18      extent of the conflict; (2) the adequacy of the
        inquiry; and (3) the timeliness of the motion").

19

20  #24, Ex. 55, at 12.

21      The state supreme court's rejection of this claim of ineffective assistance of trial

22  counsel was neither contrary to nor an unreasonable application of *Strickland*.

23      Petitioner contends that the state high court's finding "that it was unclear whether

24  counsel knew about Lopes' attempts to dismiss counsel" was unreasonable.[92]  What the court

25  stated however, was that it was unclear whether counsel was aware of *the motion*.  As the

26

27      [91]#22, Ex. 15, at 6-7 & 9-10.

28      [92]#65, at 25.

-41-

1  recital of the relevant record above reflects, it remains unclear to this day – after reviewing the
2  actual contemporaneous record – whether defense counsel was aware of the purported
3  motion dated September 24, 2001, which was not presented in an actual state court filing until
4  2005.

5          More to the point, the state supreme court did not base its rejection of the claim upon
6  a factual finding that counsel was unaware of either efforts to change counsel or of the
7  purported motion itself.  The state high court rejected the claim even after making *arguendo*
8  assumptions that "counsel was aware of the motion and was deficient in not advising the
9  district court of it."  The court rejected the claim because, even with these *arguendo*
10 assumptions, petitioner could not demonstrate prejudice.

11         A determination that there was not a reasonable probability of success on a request
12 for change of counsel was not an objectively unreasonable application of *Strickland*.  Counsel
13 would have been presenting – at the last minute up against a hard trial date – a motion to
14 change counsel based upon the defendant's lack of confidence in counsel.  It is established
15 law that a criminal defendant does not have a constitutional right to a meaningful relationship
16 with counsel or to representation only by counsel in whom he subjectively has confidence.
17 *See,e.g., Plumlee v. Masto*, 512 F.3d 1204, 1210-11 (9th Cir. 2008).  A mere "conflict" with
18 counsel based upon the defendant's loss of faith in counsel thus does not automatically entitle
19 the defendant to a change of counsel, particularly up against a trial date.  *Id.*[93]  While many
20 defendants seem to believe that they do not have to go to trial unless and until they have
21 counsel in whom they subjectively have full confidence, that is not the law.  Here, the state
22 supreme court's determination was not objectively unreasonable that there was not a
23 reasonable probability that the district court – after making an appropriate inquiry following an
24 actually articulated request for change of counsel – would have granted the request on the
25 eve of trial based upon the concerns reflected in Lopes-Benitez' translated statements.

26

27 _____

28      [93] *See also Martel v. Clair*, 132 S.Ct. 1276, 1287 (2012)(similar three-factor analysis applied on merits of motion to change habeas counsel as was applied in *Plumlee* and also by the state supreme court here).

A determination that there was not a reasonable probability of a different outcome at trial also was not an objectively unreasonable application of *Strickland*.  Petitioner once again argues that he "suffered prejudice as he was denied his right to have competent counsel represent his interests during this vital stage of the proceedings."[94]  This inapposite argument again is tantamount to a concession that petitioner cannot demonstrate prejudice under the standard that instead actually applies under *Strickland*.

Ground 3(F) does not provide a basis for federal habeas relief.

### Grounds 4(B) and (C) – Effective Assistance of Appellate Counsel

In the remaining claims in Ground 4(B), petitioner alleges that he was denied effective assistance of counsel when appellate counsel failed to raise or adequately brief the prosecutorial misconduct claim referenced in Grounds 2 and 3(D).  In the remaining claims in Ground 4(C), he alleges that appellate counsel failed to "federalize" the claim that was raised in this regard on direct appeal.

After stating the relevant legal standard, the state supreme court rejected the claims presented to that court on the following grounds:

> Lopez-Benitez next contends that appellate counsel was ineffective for failing to raise an issue of prosecutorial misconduct. However, as explained above, we conclude that even if appellate counsel had raised this matter on appeal, a different result was not reasonably probable. Accordingly, we conclude that the district court did not err in summarily denying this claim.
>
> Lopez-Benitez further contends that his appellate counsel was ineffective for failing to "federalize" his direct appeal issues in order to preserve them for federal appellate review. However, he failed to provide sufficient specific factual allegations demonstrating that the results of his direct appeal might have been different if counsel had "federalized" the issues. Consequently, we conclude that the district court did not err in summarily denying this claim.

#24, Ex. 55, at 13-14.

/ / / /

---

[94] #65, at 25.

1    The state supreme court's rejection of these claims was neither contrary to nor an

2    unreasonable application of *Strickland*.

3    When evaluating claims of ineffective assistance of appellate counsel, the performance

4    and prejudice prongs of the *Strickland* standard partially overlap. *E.g., Bailey v. Newland*, 263

5    F.3d 1022, 1028-29 (9ᵗʰ Cir. 2001); *Miller v. Keeney*, 882 F.2d 1428, 1434 (9ᵗʰ Cir. 1989).

6    Effective appellate advocacy requires weeding out weaker issues with less likelihood of

7    success.   The failure to present a weak issue on appeal neither falls below an objective

8    standard of competence nor causes prejudice to the client for the same reason – because the

9    omitted issue has little or no likelihood of success on appeal. *Id.*

10   Following upon the Court's discussion of Grounds 2 and 3(D), *supra*, the state

11   supreme court's determination that there was not a reasonable probability of a different

12   outcome on appeal had appellate counsel argued the substantive claim further or further

13   "federalized" the claim was not an unreasonable application of *Strickland*.   With regard to the

14   claim of inadequate "federalization," lack of such federalization, in the main, has not

15   precluded federal habeas review of the substantive claim.  This Court assessed the claim with

16   regard to the relevant federal standard of constitutional due process, even though petitioner's

17   argument herein in the main was directed to the inapposite broad standard of supervisory

18   power applied in federal criminal appeals.   With regard to the unexhausted confrontation

19   claim,[95] there was not a reasonable probability of different outcome on appeal if appellate

20   counsel had invoked the Confrontation Clause.  As discussed at multiple points herein, there

21   was an evidentiary foundation for the closing argument that the prosecutor made.  Petitioner

22   may disagree with the admission of evidence and/or may discount the evidence.  However,

23   as the Court has noted herein, the prosecutor was not required to shy away from arguing

24   evidence admitted over defense objection or that the defense discounted.[96]

25   Grounds 4(B) and 4(C) do not provide a basis for federal habeas relief.

26

27   [95]See #66.

28   [96]See text and record citations, *supra*, at 15 & 36.

-44-

1

*Evidentiary Hearing Request*

Petitioner's request for an evidentiary hearing is denied, as review under AEDPA is restricted to the record presented to the state court that adjudicated the merits of the claims. *See Pinolster,* 131 S.Ct. at 1398-1401.

*Consideration of Possible Issuance of a Certificate of Appealability*

Under Rule 11 of the Rules Governing Section 2254 Cases, the district court must issue or deny a certificate of appealability (COA) when it enters a final order adverse to the applicant.

As to the claims rejected by the district court on the merits, under 28 U.S.C. § 2253(c), a petitioner must make a "substantial showing of the denial of a constitutional right" in order to obtain a certificate of appealability. *Slack v. McDaniel*, 529 U.S. 473, 483-84, 120 S.Ct. 1595, 1603-04, 146 L.Ed.2d 542 (2000); *Hiivala v. Wood*, 195 F.3d 1098, 1104 (9th Cir. 1999). To satisfy this standard, the petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claim debatable or wrong." *Slack*, 529 U.S. at 484, 120 S.Ct. at 1604.

As to claims rejected on procedural grounds, the petitioner must show: (1) that jurists of reason would find it debatable whether the petition stated a valid claim of a denial of a constitutional right; and (2) that jurists of reason would find it debatable whether the district court was correct in its procedural ruling. *Slack*, 529 U.S. at 484, 120 S.Ct. at 1604. While both showings must be made to obtain a COA, "a court may find that it can dispose of the application in a fair and prompt manner if it proceeds first to resolve the issue whose answer is more apparent from the record and arguments." 529 U.S. at 485, 120 S.Ct. at 1604. Where a plain procedural bar is properly invoked, an appeal is not warranted. 529 U.S. at 484, 120 S.Ct. at 1604.

The Court will grant a certificate of appealability as to its decision: (a) that no basis for tolling or delayed accrual exists in this case after the constructive filing of the federal petition on October 1, 2008; and (b) that Grounds 1, 3(B), 3(C)(2), and 3(E) and parts of Grounds 4(B) and 4(C) do not relate back to the filing of the federal petition. The Court remains of the view

1    that its ruling on these points – in #63, at 13-22 – was correctly decided.  However, the points
2    are sufficiently debatable by jurists of reason.

3          The Court will deny a COA as to its holding – in #63, at 21-23 – that Grounds 4(A), 5
4    and 6 do not relate back.  *See Schneider v. McDaniel*, 674 F.3d 1144, 1150-52 (9th Cir. 2012).

5          The Court will deny a COA as its decision that the Confrontation Clause claim in
6    Ground 2 was not exhausted.  See #66.

7          And the Court will deny a COA as to the rejection of the claims on the merits by this
8    order, as jurists of reason would not find the rejection of the claims to be incorrect or
9    debatable, for the reasons and on the record canvassed herein.

10         IT THEREFORE IS ORDERED that petitioner's motion (#67) for partial dismissal is
11    GRANTED and that the confrontation claim within Ground 2 is DISMISSED.

12         IT FURTHER IS ORDERED that all remaining claims in the petition are DENIED on
13    the merits and that this action shall be DISMISSED with prejudice.

14         IT FURTHER IS ORDERED that a certificate of appealability is GRANTED IN PART
15    as to the Court's decision (in #63, at 13-22): (a) that no basis for tolling or delayed accrual
16    exists in this case after the constructive filing of the federal petition on October 1, 2008; and
17    (b) that Grounds 1, 3(B), 3(C)(2), and 3(E) and parts of Grounds 4(B) and 4(C) do not relate
18    back to the filing of the federal petition.

19         IT FURTHER IS ORDERED that a certificate of appealability otherwise is DENIED as
20    to the rejection of all other claims, as applicable, for failure to relate back, lack of exhaustion,
21    or on the merits.  See text, *supra*, at 45-46.

22         The Clerk of Court shall enter final judgment accordingly in favor of respondents and
23    against petitioner, dismissing this action with prejudice.

24         DATED: June 13, 2012.

25

26

27                 *Edward C. Reed.*
             _____
28             EDWARD C. REED
            United States District Judge